Good morning. I'm John Collette. I'm representing the estate of James Collette and doing this pro se on behalf of the estate. This is United States v. Structures and Leasehold Interest at 3221 Estradome Road. This is an appeal from a Rule 60b-4 action seeking a statement from the court that the possessory interests of the estate of James Collette in this property is outside the jurisdiction of the action against 3221 Estradome Road. This emanated from a number of criminal actions in 1992. Last month this court issued an order restricting this argument to whether United States v. 5145 North Golden State requires the court to affirm. In fact, Golden State argues exactly for my position. A better case to follow here is United States v. Maroof, a Ninth Circuit case from 1998, no, 1999. There the government seized a motor yacht from a person, arrested him on board, and failed to inform him that they were about to seize his property. Five years later he filed a suit against the government and this circuit found that the government made no attempt whatsoever into notifying the registered owner of that vessel. This is like that case. No attempts were made to notify the registered owner of this property. The government hired an appraisal report and bought title insurance for the property before they even filed suit. The appraisal report identified them to the government that the title was not as simple as they purported in the complaint. They purported that the title represented a fee simple interest in property owned by my wife and myself, when, in fact, they were fully aware at all times that it involved mining interests owned by three other people, one of which was my brother, James Collette. The appraisal report was absolutely clear as to the ownership of that property. They knew that on October 16th, 1992. I think we're aware of the record. We're aware of the facts. We only had one issue. It looked like to us this case, not cited by either party, disposed of the case. That it was clear that under this case, on this record, you lose. And we wanted to give you the opportunity, say, to tell us why this case, which was not cited by either party, why this case should not govern the outcome of your appeal. And I understand your pro se. We only did this in order to give you an opportunity because it hadn't been raised before. So why should we not just apply this case and conclude that you lose on your appeal? It's a matter of what the government knew about ownership and when they knew it. It's a matter of the court's jurisdiction. In Maroof, it's a matter of never the government knowing full well who owned the boat, but never bothering to inform them. Maroof was never brought before the jurisdiction of the court in that case. My brother, James Collette, was never brought before the jurisdiction of the court. The court lacked in personam jurisdiction. In North Golden State, the very first thing that the Ninth Circuit took on was, was this man before the court properly? Well, Mr. Collette, let me interrupt you to say, we're focusing, at least I'm focusing on the Rule 60B motion. You have to have standing to make that motion. And all these facts you're giving us don't bear on your standing or your brother's standing for that matter to make the Rule 60B motion. That's the only way you can get this going. If you can't make the motion, you're out. The standing is based on the idea that my brother lacked in personam jurisdiction. His property was taken without him being afforded the opportunity, any opportunity to defend his property before the court. But only, let me say, only a party can bring a Rule 60B motion. Your brother was not a representative. You might also bring a motion. But you're not his legal representative. So how can you be pursuing this course? There just isn't any avenue for you to make a 60B motion. You know, I mean, I appreciate your pro se. You may not give a much, attach much importance to the procedural rules, but we're bound by them. And if you can't qualify under 60B, you're out. Well, precisely. The probate laws and the probate courts No, stick to Rule 60B, please. Oh, okay. Well, I am the authorized representative of my brother's estate. And the action against 3221 Estradome Road, my brother was never made a party to that. That's the complaint. All I'm saying, what I'm asking for is for the court not to void the entire action against 3221 Estradome Road and all of its owners. I'm saying I want a limited declaratory statement from the court saying, as to James Scalise's interests in this property, this action had no effect. It is void only to his narrow interests. And this will result in no in-fault to anyone. It is a mere clarification of title. And it is a quiet title action, as it were. And the fact, the mere fact that he was never made a party provides me with standing before the court. Okay. Thank you, Mr. Collins. Good morning, Your Honor. My name is William Brown. I'm with the Department of Justice in Washington, D.C., representing the United States in this action. As reflected by the Court's comments, the argument is restricted to whether Lido Motel controlled, Wacol Lido Motel, the case cited in the Court's order, controls here, and we believe it does. That case, a person claimed an interest in a forfeited piece of real property, a piece of property that he owned, before the forfeiture. And he attempted to come in later, after the forfeiture proceedings had concluded, and under 60B, which provides that a court may relieve a party or a party's legal representative from a final judgment. We've read the case. Does it apply? It does. Dead bang. Solves the problem completely. Correct? It does, especially if you look at footnote 3, which ---- Counsel, my only question is, you would have saved, the government would have saved us a lot of time if they had found this case instead of us finding that case. Well, without taking any credit myself, because I didn't write the brief, I think ---- I said, I said the government. No. I was going to ---- that was an introduction saying on page 8, we say in our brief we cite this case. And we say, the short answer to Collette's claim is that because his brother never intervened in the forfeiture action against Collette's home, he was never a party to the forfeiture action, so his brother lacked standing to seek relief under Rule 60B. A putative claimant is not party to the action, citing Dobson Street and United States was a real property. Anyway, that's on page 8. So I think we did ---- perhaps it's not as clear as it should be, but we did at least attempt to raise that as one of our arguments. And I believe that it is controlling, especially because there's a ---- in addition to normal standing requirements for forfeiture, there is a statutory standing requirement of the ---- of filing the proper procedures to become a party, and that was never done. Okay. Thank you. We're aware of the case. Thank you. The matter will be submitted. And our next case is John Collette v. United States of America. Now, this case involves your claims, Mr. Collette. Again, I'm John Collette. I represent myself in this matter against the Spergen Force Administration and the United States government. The case is on appeal from a decision by Judge Weisslein in the Alaska District Court. The decision found that for 21 administrative forfeitures under review, the government, if barely, provided constitutionally sufficient notice for those forfeitures. And among the many deficiencies in Judge Weisslein's ruling is never considering that the government knew my whereabouts at all times during the entire notice period. And under Mullane, Robinson, and the Mennonite Board of Admissions, and among all other cases, the government was constitutionally required to use their knowledge of my whereabouts in its notice attempts. Instead, many addresses were used, but not where I was to be found, which the government fully knew. There was a 16-week period in which the DEA attempted to revoke my notice from beginning until the end. During that time, I was to be found in jail for 10 of those weeks. For 6 of those weeks, I was on something called third-party custody, a bail condition known in Alaska as the tightest one that you could find. I was required to be with someone 24 hours a day within sight and sound of a court-appointed attorney. The government knew where I was. The district court's opinion requires reversal because of its finding that while the DEA failed to follow constitutional notice practices in most of the attempts, nonetheless, their combined efforts achieved somehow constitutionality. This is the first time, as I know of, any court has weighed constitutionality in notice by counting the numbers of letters sent. And the district court awarded the DEA a gold star for its effort, not for its effect or its intent. But the decision finds fault with nearly every notice when sent individually. The court finds variously those sent to an SR box number, 16 of them, 15 were returned because the address was 10 years out of date. They were automatically returned by the post office. 3-221 Estradome, my home, which had been seized, the owners excluded, the doors locked. All those were returned to sender, obviously. The court found those to be insufficient as well. I was not to be found there. Then those sent to 2960 Estradome Road, my long-term mailing address and the address of my business, the court also found great fault with that because the marshals controlled the property, as found by the court, the physical mailbox, and furthermore, the court also found that the change of address order interfered with mail delivery to myself and my wife and interfered with the DEA's attempts to notify me. That's a finding by the court. But he also found that that address was sufficient because my criminal defense attorney called the DEA and said, don't send me any notices, and he gave them the 2960 Estradome address. But unbeknownst to him or me or anyone but the marshals, they controlled my mail utterly at that stage. We didn't receive any mail after they put a change of address order in. We didn't have a chance of receiving our mail when the government interfered with every attempt at mail delivery to me during the entire notice period. And then those sent to Fickin, the pretrial. Have you made any effort to identify Karen Brown? I have, very much so. What did you discover? There are five Karen Browns in Fairbanks at the time, in 1982. I've talked with three of them and deposed one. The government, as far as I know, has never found Karen Brown, even though she had access to the marshals' mailbox that provided her access to my mail, certified mail. I'm sorry, I lost the beginning of that sentence. Have you found the Karen Brown who had access? The government, as far as I know, doesn't know who Karen Brown is. They won't admit to it. And how about the Karen Browns you found? Any of them work for the government? No. So did any of them say they had access? None of them said they had access. So as far as you know, it's just an imaginary name? There was no ID requirement if someone had a key to the mailbox. The post office officials require, just like someone posted knocking on a door to a house, anybody in that residence can sign for a certified mail. The post office translates that to anybody with a key with access to a post office box may sign without providing identification. Well, I know. Let me tell you my problem. There's a finding by a judge that Karen Brown was not an employee of the government. So if she was an employee of the government, how did she get the key to the box? And one thought is that she must have had some connection with you. I was in jail at the time, Your Honor. It wasn't for me. I never had access to the government's mailbox. Well. But the government had access to both of their keys. Am I correct in understanding the government changed the mailbox? They changed the change of address order from a rural mailbox to a post office box they hired. You had never used that particular box? Never. No, I had absolutely no access to it. It was restricted. I didn't know about this until 1999. May I reserve some of my time? Yes, I believe Judge Walsh, do you have a question? Yes. Good morning again, Your Honors. Karen Brown has no relation, I take it. No one knows who Karen Brown is. As far as I know, it's no relation. What do you say to his contention that she could only have gotten the key from the marshals? There were, well, I'll just answer that directly and then drop back to a premise for that whole thing. But directly, there was evidence in the trial that there were two keys. One was held by the marshals and one was held by the manager, Mr. Stutz, of the greenhouse who got the business mail. I'm sorry, I didn't get the last part. The other key was what? Was held by a person employed by the Marshals Service to run the in connection with this key or any other way. But I need to step back. Well, I'm sorry, I'm still trying to see. How did Karen Brown get a key if she wasn't looking for the manager and she wasn't looking for the marshals? We don't think she had a key. Well, how did she sign for it then? No one knows. But if I could get back to, there's a premise stated by Mr. Collette that's putting us off on the wrong foot. He stated, and I quote, we did not receive any mail during the notice period. He contended, as he stood here today, that after the marshals put in this change of address notice, that all the mail came from, there is a, I'm not as familiar with the property as Mr. Collette is, but it's my understanding from the record that there's a piece of property out on Astrodome Road, a greenhouse. And that somewhere near there is a rural route post office, not a post office box, but a mailbox that's connected to that, that's with other pieces of, with other properties. And he said here today that after the marshals put in their change of address for business, they didn't get any more mail there. That it all went to the post office box and therefore it must be because Karen Brown got this, that Karen Brown must be a government employee. That is not consistent with the record. The court, it's very clear that the change of address that the marshals put in was intended to direct the business mail only. There's a business, like I say, the greenhouse that the marshals took over. There is a, the personal mail, I think it was called the happy, I'm not totally familiar, but there's a business name. They directed that mail to the post office box so they could get the money to the government and bills and whatever from the business operation. The personal mail remained at the, along the roadside. There was some confusion though, wasn't there? There was. As, there was testimony that at least some of the personal mail wound up in the post office box. And also there was that some of the business mail wound up in the mailbox. But it's certainly incorrect to say that they didn't get any mail at the roadside location. In fact, the only question is how much? There was some testimony from Mr. Collette's wife at the time that they got mail for a while, then it diminished significantly, and then it picked up. But I would, before the court rules that they didn't get, that this wasn't somehow a good address, that this wasn't, this was somehow totally a marshal's operation, I would like the court to look at the The former Mrs. Collette, or Mr. Collette's wife, picked, discussed her picking up all the mail she picked up there, including receipts for certified mail. The way they delivered the certified mail at that time, generally, was to keep the mail at the post office and just drop the pickup receipt. No, I'm sorry. You're saying Mrs. Collette could pick up the mail at the rural box? Is that shown by the record? Yes, that's what I was referring to. I'm going to pin you down to be sure. Pages 91 through 99. So she could have had a friend named Karen Brown or signed herself as Karen Brown? That's correct. In fact, on the very same day that the Karen Brown signatures were signed, I'll call her Mrs. Collette even though that may not be the case, was at the post office signing for a certified mail receipt that she had, signing for a piece of certified mail that had been sent to her at the Estradome address. Certainly she had gotten hers. But as we say, no one knows for sure exactly how the Karen Brown signatures got on there, but it certainly is not limited to a, it must be the marshals. This is a more general question, but it puzzled me a little bit why the government and the DA had to send out all these multiple notices. Why couldn't they have waited and sent out one saying we're forfeiting the following items and then be sure that that got to Mrs. Collette? I have literally no knowledge to import to you as to 1992 DEA procedures. I can't say that that would have been. You weren't responsible for them. Maybe you could say to somebody in the Justice Department, why don't they do that? I will. I will mention it to the forfeiture people when I get back to the criminal division as a forfeiture outfit and I can tell them. But the other thing that I wanted to make sure the court was aware of with respect to the whole notice sending operation was that this is not a case where he was incarcerated the whole time and we just failed to send it. We sent notices there. He challenged that it was insufficient. But he was released in December. And then he says, well, we knew where he was after that. He was on, at around that time, the record shows, he was giving his address out to people to send things to at the Estradome address. He was in some sort of third party custody arrangement. But he had three, he had two primary custodians and one supplemental custodian, I believe. And that only lasted for about six weeks. So if they had found out about his custodian, sent it to his custodian, he was back in jail for an alleged violation of his pretrial release by February. So he was back in for three weeks or a month before he was released again. Again, if we had gotten notice that he was back in, sent out notice to the jail, he probably wouldn't have been there by the time the notice got there. And another thing that Mr. Collette did not mention is that there's at least two of these forfeitures on the aircraft that were the forfeiture ultimately wasn't determined until late 1993. And shortly after his second release from custody prior to trial, in May of 1993, he had departed to Costa Rica without leaving a forwarding address, I'm pretty sure. And so to say that we knew where he was at all times and the government was sort of ignoring that, that doesn't really capture the gist of what happened in the situation. I have a question. We understand your point. You send out a registered mail. You get nothing back. How does that indicate that you've had reasonable service? Well, various things can happen. You can get a receipt back signed in the name of the person. Suppose you get nothing back. That may indicate that it was delivered and they lost the receipt along the way or didn't sign it. That's slightly better than something coming back saying unclaimed. So you have first, if he signs the receipt, you know he got it. And then you have the second one where nothing comes back and you want to assume he got it because the letter didn't come back. Then you have the next one that says there's no receptacle for mail and it comes back. And then you have another one, no address, such person here, it comes back. Now along that line, I suppose you're going to argue that that's good service of the notice. But do you argue that any one of those is sufficient? No, not in itself. In fact, the Supreme Court has held that it comes back if you mail it. Say you start out and you think that 3221, the old residence address, is the right place to send it. And as they did here for some of the properties, they send it out. It comes back and it says unclaimed or no such address or whatever. Under the current case law, the government can't close its eyes to that. It has to, if practical, if it can find another address, it has to like do some, you can't just ignore that. If you get notice, it probably isn't good service. You have to do something else. Does the Supreme Court help you any this last term on what the something else might be? I'm not familiar with cases where they have. I was thinking of the Roberts case by Chief Justice Roberts, where if it doesn't come out, then you can send regular mail and that would be sufficient. Did you do, did the government do that at all when there was something less than an indication by a return receipt that you sent regular mail the same thing? Did the government do that? No. And there was no real claim here that, in some cases, people have said, well, certified mail is not as good because of one reason or another. But that was never a claim here. Because in Arch Forge, because they just come out to the, they went to the same locations. They would have gone and leave the slips. And there was, this is not a case where the person was unable to pick it up. I mean, as we were discussing, if the, Mr. Collette's ex-wife was there, she could have forwarded it on or made some sort of arrangement. But anyway, that's, it's my understanding from the Supreme Court cases that they don't prescribe that certain things would be, when they find it inadequate, they don't say, well, you should send it regular mail. What they say is you should try to do something else that makes sense. And I think that's what the cases say here. In the Jones v. Flowers case, I think they suggested, you know, posting it on the, that was a tax seizure of residence. They suggested posting it on the house as one solution. Obviously, that's not a solution for personal property where the people aren't there. I mean, every case has its different context. And that's what the Supreme Court has held, that you have to look at it and take, do what a person would do if you really wanted to get notice here. Multiple, excuse me, multiple attempts, and including attempts at the longtime mailing address, which the attorney said, hey, this is the one to use. What happens if we find any of these, the notice was insufficient? Do you have to go around and serve notice and start over again? I think there might be a bar to starting at this late date. But I'm not sure that it wouldn't, because there were just administrative forfeiture of these items. If the court found that we were constitutionally deficient, the statute of limitations for seeking forfeiture may well have passed. But I'm not conceding that's true, but I think that might be a problem. At this time when the government used the certified mail, were there rules that governed how the post office would handle that mail? Oh, there's, yes. There were at least policies. I thought one of the purposes of using certified mail was that the sender would get back the receipt or some acknowledgement about what happened with the item. That is one purpose if you ask for a return receipt, certainly. Wasn't that what happened here? Yes, we always ask for a return receipt. How is it possible that nothing came back? If the receipt isn't, if the post office doesn't do what it was supposed to do. Well, not the post office would keep the item, but post a little notice on the door about, you know, they came out or they came to deliver a certified mail. You have to go to the post office and pick it up. Isn't that right? Yes, that's what they. They don't just leave the item on the receipt at the residence. That's correct. They keep the item. They leave notice that they were there. And they ask the recipient to come to the post office and sign off on it. That's correct. But here nothing happened. On. On several of them. On several of them. Some of them came back. I thought there was one that was sent certified, but there's no record of whatever happened. The item didn't come back. The notice of receipt didn't come back. Yes, if it hadn't been, I mean, by policy. What should have come back was either something saying it was delivered or it wasn't delivered for whatever reason. But here there's nothing. My concern was given the regulations that govern certified mail, that seems highly unlikely that nothing would come back. The post office wouldn't have the unclaimed item. It just seems kind of strange. The, I think what is generally perceived in that situation is that since the item is, all of the matter is just a matter of this little receipt card not making its way back. Is there anything in the record that shows these postal regulations or how they deal with certified mail? I have my own experience with it. But was there any evidence that the government put in as to what happens to certified mail, what their process and procedures are? Was there anything in the record on that? There was testimony from postal employees at the post office as to what the general policies were for delivering certified mail. But that doesn't, it doesn't, like for example, requiring ID, for example, of the person or something without address or some connection. But with the caveat that, or maybe they knew the person or. But there was nothing in the record to show why something would not come back at all? From the post office? Yes, from the post office. From their. No, there would be no official reason, as I understand it from the record, there would be no official reason for it not to come back. All it would mean was that at some point between the mailing and the return of the receipt card, that things went awry. Could have gotten lost in the post office, could have gotten lost at the recipient, could have gotten lost someplace. The receipt card could have gotten lost. It could have gotten lost, the receipt card could have been lost in the incoming mail at DEA. Could have been lost. You know, from that you can't tell. The point I was making earlier is that when it comes back unclaimed, you know that it wasn't delivered. Correct. When there's nothing comes back, it's actually better in this, excuse me again, in the sense that it may well have been delivered. When it doesn't come back, is it fair to treat it as tantamount to just sending it by first class mail? Probably. But I think for all of these things. But when one resorts to certified mail, I mean, I would think one does it because they want some assurance that it was delivered and received at the residence. That's correct. But I think for all these things, it's just a common sense. And as the judge did, he looked at it to see whether the government had made it the appropriate effort in each case. Okay. And he did. Thank you. Thank you. We appreciate your argument. Mr. Clyde, you had a few minutes to, you can respond to what the government has said. The government has alleged to what my ex-wife said in testimony about her experience with the rural mailbox. And they got it completely wrong. What she said was. I'm sorry. Your voice sometimes sinks. I didn't hear, what was your last phrase? Okay. But the government has it completely wrong. The facts are that my ex-wife testified that the mailbox was full, overfilled every day, except one day everything was gone. A little later, she said, she received a little bit of mail and a notice from the post office saying that all mail had been forwarded from that post office, that rural mailbox, to a new mailbox that the marshals had hired. So she saw that forward and had said, all mail directed to 2960 Estradome Road is hereby redirected to a new address hired by the marshals. That's pretty clear on her testimony. My testimony is I never got any mail there. And I didn't. Not a single thing. Her testimony further went on to say, late in the spring, this was well after the DEA notice exercise ended, she received a few bits of mail there. That's April, May, or June. You say when she went out and the box was overflowing and then it was all gone, you mean to say somebody took it or what? It was forwarded. It was after November 4th. Oh, but all that stuff in the box that she found, what happened to that? She received that while she had control of the mailbox. She lost control and I lost control of the mailbox on November 4th when the marshals put a change of address order in. I get it. Then it stopped. And then she received, the last thing really she got from the mailbox was a change of address order, informing that mailbox that heretofore everything was going to be directed towards the new mailbox. That's the testimony in great preponderance. Is that it, Mr. Collette? Thank you. Okay. Is my time up? Did you have something else you wished to say? You had about a minute left. Let's see. It says zero. So does that mean zero? Okay. Well, thank you very much. Thank you, Mr. Collette.
judges: Wallace, Noonan, Paez